UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **LESLIE EDWIN "LES" MILES,**<br><br>                    Plaintiff,<br><br>v.<br><br>**LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE a/k/a LOUISIANA STATE UNIVERSITY, BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE, the NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, and the NATIONAL FOOTBALL FOUNDATION AND HALL OF FAME INC.,**<br><br>                    Defendants. | Civil Action No.<br><br>**COMPLAINT** |

"Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). Despite that clear moral, legal, and Constitutional mandate, Defendants stripped Les Miles—indisputably one of the most esteemed college football coaches in the history of the State of Louisiana—of his established eligibility for the College Football Hall of Fame without an opportunity to be heard.

Plaintiff Leslie Edwin "Les" Miles ("Miles" or "Plaintiff") now seeks appropriate remedy for the blot placed on his good name and reputation when Defendants deprived him of his Hall of Fame eligibility without due process.

As and for his Complaint against Louisiana State University and Agricultural and Mechanical College a/k/a Louisiana State University ("LSU") and the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board" and

1

collectively with LSU, the "LSU Defendants"), the National Collegiate Athletic Association (the "NCAA"), and the National Football Foundation and Hall of Fame Inc. (the "NFF"), by and through his counsel, Moskowitz, Colson, Ginsberg & Schulman LLP and Looper Goodwine, P.C., Plaintiff alleges as follows:

## THE PARTIES

1. Plaintiff is a natural person and a resident of Florida.

2. Defendant LSU was at all relevant times and continues to be the premiere flagship public university of the State of Louisiana. LSU is located in Baton Rouge, Louisiana, in the Parish of East Baton Rouge, with its principal place of business at 3810 West Lakeshore Drive, Baton Rouge, Louisiana 70808.

3. LSU is organized and existing under the laws of the State of Louisiana. It operates pursuant to the Louisiana legislature's establishment of a public educational system, as required by Article VII, Section 1 of the Constitution of the State of Louisiana.

4. The Board of Supervisors of Louisiana State University and Agricultural and Mechanical College was created as a body corporate by Article 8, Section 7 of the Constitution of the State of Louisiana. Pursuant to that provision, the Board is authorized and responsible for "supervis[ing] and manag[ing] the institutions, statewide agricultural programs, and other programs administered through its system," including LSU.

5. The Board was at all relevant times and continues to be the governing body of LSU.

6. The National Collegiate Athletic Association is a nonprofit organization headquartered in Indianapolis, Indiana. The NCAA regulates student athletics at more than one thousand colleges and universities in the United States and Canada, including LSU.

7. The National Football Foundation and Hall of Fame Inc. is a nonprofit organization headquartered in Irving, Texas. As relevant herein, the NFF is responsible for supporting, administering and operating the College Football Hall of Fame. In reality, other than the administrative duties of operating the College Hall of Fame, NFF acts as an instrument of, and, with regard to all but administrative matters, is under the control of, and answers to, the NCAA.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it presents federal questions and pursuant to 28 U.S.C. § 1343(3) because it seeks redress for the deprivation, under color of state law, of Plaintiff's rights under the 14th Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

9. This Court is empowered to exercise personal jurisdiction over Defendants because Defendants are physically present and transact business in the Middle District of Louisiana.

10. Venue is proper in the Middle District of Louisiana pursuant to 28 U.S.C. § 1391(b)(1) because certain Defendants are domiciled and have their primary places of business within this District, the events giving rise to this action occurred within this District, and all Defendants are otherwise subject to this Court's personal jurisdiction. Venue also is proper because a substantial part of the events giving rise to Plaintiff's claims took place within this District.

11. This Court is empowered to issue a declaratory judgment pursuant to 28 USC §§ 2201 and 2202.

## FACTUAL BACKGROUND
### *Plaintiff's Exceptional Career as Head Coach*

12.     After serving apprenticeships and as an assistant coach at various institutions, including the University of Michigan, Miles became the head football coach at Oklahoma State University in 2001.  In the three years before he became Head Coach, the Oklahoma State Cowboys finished 5-6, 5-6, and 3-8.  In his first season, the Cowboys continued to have a losing record, but Miles's exceptional skills as a coach were soon evident: during the last game of that season, Miles coached the Cowboys to a 16-13 upset over the University of Oklahoma Sooners in the Sooners' home stadium.

13.     During Miles's second season at Oklahoma State University, the Cowboys achieved a winning record for the first time in years.  In recognition of the remarkable turnaround he engineered as Head Coach, Miles was named the Big 12 Conference Coach of the Year in 2002.

14.     In the final three of Miles's four seasons as Head Coach of the Oklahoma State Cowboys, the Cowboys continued to improve, maintained a winning record, and were invited to the Houston Bowl, the Cotton Bowl, and the Alamo Bowl, respectively.

15.     Miles was named the thirty-second Head Coach of the LSU Tigers football team on January 2, 2005.  He remained in that role until September 25, 2016.

16.     By any objective measure, Miles's performance as LSU's Head Coach over the course of over eleven seasons was exceptional.  Indeed, he remains the winningest coach in LSU history, having won 77% of the games he coached at LSU.

17.     Miles was immediately successful as Head Coach, leading his team to the SEC title game in 2005.  No other coach in SEC history had ever coached a team to the title game in his first year.

18. Miles led the LSU Tigers to victory in the SEC title game in 2007, his third year as head coach. In that same year, he coached the Tigers to the team's third national championship victory.

19. The Tigers, under Miles's leadership, claimed the SEC championship again in 2011 after going 13-0 in the regular season. That year, Miles was named the American Football Coaches Association Coach of the Year for Division I FBS, the Associated Press National Coach of the Year, the Home Depot National Coach of the Year, the Walter Camp National Coach of the Year, and the Liberty Mutual National Coach of the Year.

20. Miles as of that time was the only coach in LSU history to beat Auburn, Florida and Alabama in the same season—a feat he accomplished three times.

21. LSU also appeared in eleven bowl games under Miles, winning seven of them.

22. Over the course of Miles's career as Head Coach at LSU, the Tigers won more games than any other team in the SEC.

23. Under Miles's leadership, the Tigers won ten or more games in eight of his eleven seasons as Head Coach, averaging ten wins each season over Miles's term as Head Coach.

24. Under Miles's leadership, the Tigers extended their streak of consecutive seasons with at least eight wins to 16 straight.

25. Miles also led the Tigers to extend their streak of seasons with a bowl game appearance to sixteen consecutive years.

26. Miles guided LSU to five top 10 finishes with three coming in the top five and won double-figure games seven times.

27. Student-athletes at LSU thrived under Miles's leadership, both athletically and academically. Miles's coaching produced 22 first team All-Americans. Eleven of his players won

national awards. Of the 242 players who earned their degrees during his term as Head Coach, 187 earned SEC Academic Honor Role status.

28. Overall, Miles achieved more victories on the field during his eleven-plus years heading the LSU football program than any coach has ever earned in a similar period of time in the history of the program. Indeed, Miles earned more wins in his LSU career than were earned by any Head Coach other than the legendary Charlie McClendon—and McClendon achieved only twenty-one more wins in eighteen years than Miles earned in just twelve seasons.

29. Miles finished his LSU career as the winningest coach in the program's history, having earned the highest winning percentage of a Head Coach in LSU history (77%) and posted a 114-34 record over the course of 11-plus seasons as Head Coach of the LSU Tigers football team.

30. After leaving LSU in 2016, Miles served briefly as Head Coach at the University of Kansas.

31. Miles ended his career having coached over 200 games and achieved an overall win-loss record of 143-73 over the course of more than 15 years as a Head Coach.

### *The NCAA Investigation at LSU*

32. On or about June 22, 2023, an Independent Resolution Panel for NCAA Division I released a Public Infractions Decision (the "Public Infractions Decision") addressing a number of recruiting and player benefits infractions alleged to have occurred in LSU's football and basketball programs.

33. The bulk of the alleged NCAA rule infractions involved the basketball program.

34. The NCAA found three violations of its rules in connection with the LSU football program. Two of the violations occurred in 2019 and 2020, long after Miles ceased his employment with LSU.

35. Only one of the three violations found by the NCAA occurred while Miles was Head Coach of the LSU Tigers. Specifically, the NCAA found that an outside booster of the football program—who was not employed by LSU and who had no formal or informal position with the football program—provided impermissible financial benefits to the parents of a football player. That booster, the President of the Our Lady of the Lake Foundation (a nonprofit foundation that supports the Our Lady of the Lake Hospital in Baton Rouge), was a donor to the Tiger Athletic Foundation (a nonprofit which supports LSU athletics), and he purchased season tickets to LSU's football games. The NCAA found that the booster offered to employ a student-athlete's parents at the Our Lady of the Lake Foundation and/or at a hospital supported by that foundation, and that he eventually caused the foundation to hire the father. The father was employed by the Our Lady of the Lake Foundation for a five-year period beginning in approximately February 2012 and ending in January 2017, during which time the father did very little work in exchange for his salary. The booster who orchestrated and carried out this scheme eventually pleaded guilty to federal offenses for defrauding the Our Lady of the Lake Foundation in connection with the father's employment and embezzling the father's salary from that foundation. The NCAA found that this scheme was a Level I violation of its rules.

36. The NCAA hearing panel further found that LSU's failure to monitor the activities of its football boosters was a Level II violation of NCAA rules.

37. Notably, LSU did not become aware that a student-player's father had been inappropriately compensated, and that the student-player was therefore ineligible to play, until November 2018, approximately two years after Miles departed from LSU.

38. No other violation of NCAA rules was found to have occurred at the LSU Tigers football program during Miles's time as Head Coach.

39. The NCAA found that two additional violations occurred after Miles left the program in 2016: a Level III violation in 2019, in which Miles's successor as head coach discussed recruiting with a high school coach in the presence of a student-athlete and a Level II violation in 2020 that involved small payments made to students by an outside booster.

40. The hearing panel also found six violations of NCAA rules by the LSU basketball program: three Level I violations, two Level II violations, and one Level III violation. Unlike the violation carried out by the football booster, which implicated the football program only to the extent of a failure to supervise, five of the six violations involving the basketball program directly implicated the basketball program and its coaches.

41. NCAA Bylaw 11.1.1.1 provides that an institution's head coach is presumed to be responsible for the actions of all institutional staff members who report to him. The booster was not an institutional staff member of LSU or its football program and the NCAA did not find that Miles, as Head Coach, bore any responsibility for the sole violation that occurred during his time with the LSU football program.

42. In response to the NCAA investigation, and before the NCAA imposed penalties, the LSU Defendants self-imposed a variety of penalties, including scholarship reductions and recruiting restrictions.

43. The LSU Defendants also proposed to vacate, with retroactive effect, all of its football wins in which the student whose father was employed by the booster participated.

44. In issuing the Public Infractions Decision, the NCAA accepted the LSU Defendants' self-imposed penalties and set forth additional terms governing those penalties. Those terms, like the substantive penalties imposed, were the product of agreements between the LSU Defendants and the NCAA.

45. As relevant herein, the Public Infractions Decision to which the LSU Defendants and the NCAA agreed vacated a total of 34 wins the LSU Tigers achieved under Miles's leadership as Head Coach. The LSU Defendants and the NCAA further agreed that in vacating those wins, student-athletes' individual finishes and awards would be preserved, but that Miles's win-loss record would be retroactively amended to remove the vacated wins as though they had never occurred.

46. The NCAA and the LSU Defendants further agreed that all public references to the vacated wins as wins or victories would be removed from all LSU records, promotions and advertisements, and that all publications in which Miles's win-loss record was reported would be amended to reflect the retroactive changes.

47. Importantly, the NCAA and the LSU Defendants also barred Miles from applying the vacated wins toward specific honors or victory "milestones" of any kind.

48. In issuing the Public Infractions Decision, the NCAA and the LSU Defendants further agreed to forbid, and did forbid, any other or future employer of Miles from considering the vacated wins in assessing his record or his eligibility for honors of any kind.

49. The NCAA imposed only a three-year probationary period on the LSU football program and explained that its decision to impose a comparatively minor penalty was, to a

9

substantial degree, the result of the mitigating weight it gave to LSU's decision to self-impose penalties, including its voluntary vacation of the football wins.

50. Notwithstanding the more serious violations committed by the LSU basketball program and the fact that the basketball team's coaches were directly implicated in those violations, LSU did not vacate any basketball victories and did not retroactively amend the basketball team's record (or that of any basketball coach) to remove any basketball wins.

### *The College Football Hall of Fame*

51. The NFF established the College Football Hall of Fame in 1951 to immortalize the most successful college football players and coaches in America.

52. The NFF, as the entity responsible for the College Football Hall of Fame, establishes criteria, in conjunction with, and with the express or tacit approval of, the NCAA, for players' and coaches' eligibility to be nominated and admitted.

53. In fact, and historically, the NFF is an instrument of, and is controlled by, the NCAA. Upon information and belief, the NFF has never failed to accept direction from the NCAA regarding the substantive operation of, or substantive policies for, the College Football Hall of Fame nor has it acted substantively in a manner contrary to the NCAA's dictates.

54. Pursuant to the NFF's criteria, a college football head coach becomes eligible for nomination and admission to the College Football Hall of Fame three seasons after retirement, or immediately upon retirement if the coach is at least 70 years old. Active coaches become eligible at the age of 75.

55. To be eligible for admission, a coach of any age must also have been a head football coach for a minimum of ten years, he must have coached at least 100 games, and he must have earned a winning percentage of at least .600.

**FIRST CLAIM FOR RELIEF**
**Conspiracy to Violate Miles' Fourteenth Amendment Due Process Rights,
in Violation of 42 U.S.C. § 1983**

(*Against All Defendants*)

56. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

57. Plaintiff retired as a head coach more than three years ago.

58. Plaintiff served as a head football coach for substantially longer than ten years.

59. Plaintiff coached 216 games during his career as a head coach, achieving an overall win-loss record of 143-73 and a winning percentage of .665.

60. Accordingly, had the LSU Defendants not proposed to vacate a substantial number of wins in an effort to mitigate NCAA penalties, had the NCAA not accepted that proposal, and had the NFF not acquiesced in and accepted that proposal, Miles would be eligible for nomination to the College Football Hall of Fame.

61. Miles achieved a win-loss record of 37-14 at LSU during the period 2012 through 2015, but the Defendants agreed retroactively to vacate all 37 wins achieved during that period. As a result, Defendants officially recognize LSU as having gone 0-14 for the period from 2012 through 2015. Further, pursuant to the agreement, the NCAA has dictated that no other school or entity regulated by the NCAA may recognize those 37 wins or consider them when calculating Miles's winning percentage or determining his eligibility for honors of any kind, including his eligibility for nomination to the College Football Hall of Fame.

62. Because of the Defendants' agreement to vacate 37 wins for the period 2012-2015, and pursuant to the terms and dictates of the Public Infractions Decision, Miles's career record now "officially" stands at 108-73, for a winning percentage of .597.

63. Thus, as a result of the Defendants' agreement to vacate 37 wins, Miles now has a winning percentage that is 0.3% below the eligibility threshold for nomination to the College Football Hall of Fame.

64. Only certain persons affiliated with NCAA-regulated institutions may nominate an otherwise-eligible coach for admission into the College Football Hall of Fame. Thus, the agreement among the Defendants retroactively to modify Miles's win-loss record, as embodied in the Public Infractions Decision, is controlling for purposes of Miles's College Hall of Fame eligibility.

65. Miles had property interests in the vacated wins and in his eligibility for nomination to the College Football Hall of Fame.

66. The LSU Defendants failed and refused to provide Plaintiff with notice and an opportunity to be heard, or with any other form of due process, before Defendants took from Plaintiff his eligibility for nomination to the College Football Hall of Fame by vacating 37 wins earned during Plaintiff's career as Head Coach of the LSU Tigers football team.

67. Upon information and belief, the LSU Defendants' decision not to provide Miles with any form of due process was made in agreement with the NCAA, and in furtherance of the LSU Defendants' negotiations with the NCAA concerning additional and more-severe penalties that otherwise likely would have been imposed on LSU and its athletics programs.

68. Defendants' deprivation of Plaintiff's rights without due process was intentional or, at a minimum, Defendants acted recklessly and with callous disregard for Plaintiff's rights.

69. Defendants' deprivation of Plaintiff's property rights without due process of law was a violation of 42 U.S.C. § 1983 for which Plaintiff is entitled to remedies to rectify that property right deprivation, including an equitable injunction directing Defendants to withdraw and

vacate that portion of the Public Infractions Decision that vacates the wins and forbids recognition of the vacated wins for purposes of determining Miles's eligibility for the College Football Hall of Fame, and further directing Defendants not to interfere with any nomination of Miles for acceptance into the College Football Hall of Fame.

## SECOND CLAIM FOR RELIEF
### Declaratory Judgment

**(*Against All Defendants*)**

70. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

71. Plaintiff's true career win-loss record is 143-73 and his true career winning percentage is .665.

72. Plaintiff retired more than three seasons ago, served as Head Coach for more than ten years, coached more than 100 college football games, and is otherwise eligible to be nominated for admission into the College Football Hall of Fame.

73. Wherefore, Plaintiff seeks a declaratory judgment:

   a. Declaring that Miles is eligible for nomination to the College Football Hall of Fame;

   b. Declaring that the vacated wins shall be considered wins for purposes of determining Miles's eligibility for nomination and admission to the College Football Hall of Fame;

   c. Declaring that any agreement between or among Defendants not to consider the vacated wins in determining Plaintiff's eligibility for nomination and admission to the College Football Hall of Fame or for any other honor is void and unenforceable; and

    d. Declaring that any agreement between or among Defendants to prevent or hinder any nonparty from considering the vacated wins in determining, *inter alia*, Plaintiff's eligibility for nomination to the College Football Hall of Fame or for any other honor is void and unenforceable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff and against Defendants:

1. Equitable relief as set forth in Plaintiff's First Claim for Relief herein;

2. Declaratory judgment as set forth in Plaintiff's Second Claim for Relief herein;

3. Fees and costs of the instant action pursuant to 42 U.S.C. § 1998; and

4. Such other and further relief that the Court may deem just and proper.

Dated:    New York, New York
           June 17, 2024

MOSKOWITZ COLSON GINSBERG
& SCHULMAN, LLP

By: */s/ Peter R. Ginsberg*
Peter R. Ginsberg, Lead Attorney
(*Pro Hac Vice* Application Forthcoming)
Christopher R. Neff
(*Pro Hac Vice* Application Forthcoming)
80 Broad St, 19th Floor
New York, New York 10004
Telephone: (212) 257-6455
Email: pginsberg@mcgsllp.com

-and-

LOOPER GOODWINE P.C.

By: */s/ Taylor P. Mouledoux*
Taylor P. Mouledoux (La. Bar No. 31889)
650 Poydras Street, Suite 2400
New Orleans, Louisiana 70130
Telephone: (504) 503-1500
Facsimile: (504) 503-1501
Email: tmouledoux@loopergoodwine.com

*Attorneys for Plaintiff*
*Leslie Edwin "Les" Miles*

15